**SO ORDERED.**

**SIGNED this 01 day of March, 2011.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **FREDDIE WAYNE LONG,** | ) | **Case No. 09-12827** |
| | ) | **Chapter 13** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| **REVEST, LLC** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 09-5303** |
| | ) | |
| **FREDDIE WAYNE LONG,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**ORDER ON REVEST'S MOTION TO DISMISS**</u>

1

**AND MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff ReVest, LLC ("ReVest") filed two dispositive motions.[1] The first is a combined motion to dismiss and for summary judgment filed on July 7, 2010, seeking dismissal of Freddie Wayne Long's fraud claim and summary judgment on: (1) Long's Kansas Consumer Protection Act ("KCPA") claim against ReVest for unconscionable conduct in connection with the acquisition of the properties; (2) Long's quiet title claim against ReVest; and (3) ReVest's complaint for a judgment declaring it the owner of certain real property free and clear of any interest of Long.[2] The second motion, filed on January 10, 2011, seeks summary judgment on Long's remaining KCPA claims to the extent that Long seeks the remedy of money judgments.[3]

Jurisdiction

This adversary proceeding is a core proceeding and a "related to" proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

ReVest's Motion to Dismiss Converted to Motion for Summary Judgment

ReVest moves to dismiss Long's common-law fraud claim for lack of specificity under Federal Rule Civil Procedure 9.[4] Rule 9 requires that fraud claims be pleaded with specific facts regarding who said and did what to whom, and when the commissions or omissions occurred.

---

[1] Dkts. 37 and 68.

[2] Dkt. 37.

[3] Dkt. 68. ReVest's second motion addresses both Long's initial unconscionablity claim under Kan. Stat. Ann. § 50-627 and his "bootlegged" deceptive practices claim under Kan. Stat. Ann. § 50-626. As the Court has denied Long's motion to add the latter claim, only the unconscionability issue is considered here.

[4] All future references to "Rule" will refer to the Federal Rules of Civil Procedure which apply to adversary proceedings under Federal Rule Bankruptcy Procedure 7001, *et seq.* unless otherwise noted.

ReVest claims the Amended Counterclaim does not indicate who at ReVest made the false statements, what was said, how Long relied upon those statements, or how those statements caused Long damage.

Because ReVest has submitted affidavits and exhibits in support of its motion and Long has submitted an affidavit and other exhibits in opposition, the Court must determine whether to treat it as a motion for summary judgment.[5] The Court assumes the parties know this rule and, accordingly, considers that when each of them referred to matters outside the pleadings, they knew that Rule 56 treatment might be the result. Because both parties rely on materials outside the pleadings, the Court will convert ReVest's motion to dismiss Long's fraud claim to one for summary judgment.[6]

Summary Judgment Standards

Rule 56(c) directs the entry of summary judgment in favor of a party who "shows that there

---

[5] Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." The parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. *Wheeler v. Hurdman*, 825 F.2d 257, 260 (10th Cir. 1987), *cert. denied*, 484 U.S. 986 (1987) ("[W]hen a party submits material beyond the pleadings in support of or opposing a motion to dismiss, the prior action on the part of the parties puts them on notice that the judge may treat the motion as a Rule 56 motion."). In ReVest's second motion for summary judgment (Dkt. 68), ReVest indicated that it had sought **summary judgment or dismissal** of Long's fraud claim.

[6] The Court notes that if the Amended Counterclaim is read in conjunction with Long's affidavit, Long has alleged sufficient facts from which to infer who made the statements, what was said, and when they were said. Len Marotte or Brent Hurst made the representations on behalf of ReVest. *See* Dkt. 46, Affidavit of Freddie Long at 2, ¶ 24. The representations were something to the effect of either: (1) the Purchase Agreement is a loan, not a sale; (2) as long as Long continued to make payments, Long would be able to pay off the loan and keep his properties; or (3) payments would assist Long in repurchasing his properties and the option to repurchase would continue to be available. These representations were made in September 2005, December 2006, February 2007, April 2008, June 2009, and as late as September 2009.

Case 09-05303   Doc# 102   Filed 03/01/11   Page 3 of 29

is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."[7] The Court's function in reviewing a motion for summary judgment is to first determine whether genuine disputes as to material facts exist for trial. In making this determination, the Court may not weigh the evidence nor resolve fact issues.[8] The Court must construe the record in a light most favorable to the party opposing the summary judgment.[9]

Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of law.[10] If different ultimate inferences may properly be drawn from the facts, summary judgment is not appropriate.[11]

Uncontroverted Facts

For the purpose of these motions, the Court will deem as admitted all material facts contained in the statement of movant unless the statement of the opposing party specifically

---

[7] Fed. R. Civ. P. 56(a). Before December 1, 2010, Rule 56 provided that summary judgment should be rendered if there is *"no genuine issue as to any material fact* and that the movant is entitled to judgment as a matter of law."

[8] *First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1154 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)); *Concrete Works of Colo., Inc. v. City and Cnty of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (Court may not resolve disputed questions of fact at the summary judgment stage).

[9] *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir. 1988) (citation omitted).

[10] *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D. Kan. 1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.).

[11] *Sec. Nat. Bank v. Belleville Livestock Comm'n Co.*, 619 F.2d 840, 847 (10th Cir. 1979).

4

controverts those facts.[12]  Likewise, the Court will deem admitted all material facts included in the non-moving party's statement of additional facts unless the movant's reply specifically controverts those facts.[13]  The Court will disregard those factual disputes that are not material to the outcome. The Court will also disregard the characterization of facts, whether made by the movant or the non-movant.  For example, the characterization placed on an admitted transaction or transfer will be disregarded.[14]  The characterization of a transaction is a question of law for the Court.

To properly controvert an assertion of fact, a party must cite to particular parts of materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[15]  Long's inability to recall certain facts (*i.e.*, receipt of letters) or to verify figures because of his poor recording keeping are not proper controversions of those facts.

Both parties use the deposition of Long to support their contentions.  ReVest cites to several statements made by Long in his deposition by page and line and attached the complete transcript of the deposition as it was taken on December 9, 2010.  Local Bankruptcy Rule 7056.1(a) requires that parties support their contentions by citing to the record with particularity.  ReVest has done this. The Court has read only those portions of the deposition particularly cited by ReVest and Long.

---

[12]  Fed. R. Civ. P. 56(e) and D. Kan. LBR 7056.1(a).

[13]  D. Kan. LBR 7056.1(b)(2).

[14]  *See Patton v. AFG Indus., Inc.*, 92 F.Supp.2d 1200, 1202 n. 3 (D. Kan. 2000) (Controversion only denied characterization of a fact [a conversation] and therefore the fact is deemed admitted); *Stephens v. City of Topeka, Kan.*, 33 F.Supp.2d 947 (D. Kan. 1999) (Conclusory terms or characterizations without any concrete facts to support characterizations are afforded no weight by the court); *Rogers v. United States*, 58 F.Supp.2d 1235 (D. Kan. 1999) (The general characterization of a transaction is a question of law).

[15]  Fed. R. Civ. P. 56(c)(1)(A) and (B).

5

Long attached a complete "corrected" transcript of the deposition to his response and cites with particularity to the same passages ReVest relied on, but which he has altered in a manner that he believes creates material factual controversy. As ReVest notes in its response, this tactic is likely improper. The Tenth Circuit has likened this to filing a "sham" affidavit, a practice that is clearly barred by Rule 56(h).[16] As corrections are filed under penalty of perjury or under oath, the Court considers them the equivalent of declarations for the purpose of Rule 56 and evaluates them by determining: (a) whether the deponent was cross-examined during his testimony; (b) whether the affiant or deponent had access to the pertinent evidence at the time of his earlier testimony or whether the corrections were based on newly-discovered evidence; and (c) whether the earlier testimony reflects confusion which the corrections could explain.[17] These corrections were filed and signed by Long *after* the second summary judgment motion was filed and without listing any reason for the changes. They do not meet any of the above tests and will therefore be disregarded.

The Court finds the following facts to be established for the purpose of trial.[18]

1.      ReVest is a Kansas limited liability company with its principal place of business at 1999 N. Amidon, Suite 224, Wichita, Kansas.

2.      Long is the debtor in the captioned bankruptcy case and resides at 337 N. Lark Lane, Wichita, Kansas. He is the sole proprietor of Aero Comm Machining, an aircraft parts manufacturing company. He began the business in 1969 with the assistance of his wife, Patsy Long, who handled their personal and business finances.

---

[16] *Burn v. Board of County Comm'rs of Jackson County*, 330 F.3d 1275, 1281-1282 (10th Cir. 2003).

[17] *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[18] *See* Rule 56(g).

6

3.      After a long illness, Patsy Long died of cancer in November 2004. Prior to her death, Long had a number of health problems including a stroke in 2004.

4.      During his wife's illness, and after her death, Long was deeply depressed and neglected his personal and business finances. He incurred a substantial tax debt to the Internal Revenue Service.

5.      In September 2005, after a failed attempt to obtain a loan from a local bank to pay off his tax debt, Long contacted ReVest to borrow money. Long was 61 years old when he first met with Len Marotte of ReVest. During this time, Long suffered from depression and memory issues as a result of his 2004 stroke and other physical ailments.

6.      On October 4, 2005, Long and ReVest executed an agreement, entitled "Purchase Agreement," relating to five properties then owned by Long: the Bonn Property, the St. Clair Property, the 167th Street Property, the Reno County Property, and the Lark Property (collectively referred to as "the Properties"). The Purchase Agreement had three major provisions. It first provided for the sale of the Properties from Long to ReVest for $250,000 plus closing costs and unpaid property taxes for a total of $266,100. Second, ReVest would lease the Properties back to Long beginning on November 1, 2005 and ending October 31, 2006. Third, ReVest granted Long an option to buy back the Properties for $291,000 on or before October 31, 2006.[19]

7.      Long understood the nature of the transaction and the rights he had as a result of it.[20]

---

[19]  Dkt. 37-2, Ex. A, Purchase Agreement Dated October 4, 2005.

[20]  Long initially testified that he understood that he could either choose to exercise the option to repurchase or not and that if he chose to "walk away," he would owe ReVest nothing. Long later "corrected" his testimony to state with respect to questions about this, "Yes, the agreement says that." As noted above, the Court disregards the corrected testimony.

7

8.     ReVest allocated the $266,100 purchase price as follows:  $117,000 to the Lark Property, $66,000 to the Reno County Property; $30,000 to the Bonn Property, $42,000 to the St. Clair Property, and $11,100 to the 167th St. Property.

9.     Long estimated the values of the Properties at or near the time of the Purchase Agreement totaled $538,000, divided as follows: $160,000 for the Lark Property; $200,000 for the Reno County Property; $55,000 for Bonn Property; $63,000 for the St. Clair Property; $60,000 for the 167th Street Property.

10.     Long acquired the Bonn Property in the 1960s from one of his wife's relatives by making an undisclosed down-payment and taking over the house payments.  Long purchased the St. Clair Property for $57,000 in 1995.  Long purchased the 167th Street Property in 1996 or 1997 for $50,000-$52,000.  Long purchased the Reno County Property sometime after 1996 or 1997 for $25,000.  Long purchased the Lark Property for $93,000 in 1992.

11.     On or about October 4, 2005, Long executed and delivered warranty deeds covering the Properties to ReVest, who recorded them in the appropriate Register of Deeds' offices.[21]

12.     ReVest financed its purchase of the Properties with a loan from US Bank.  At the closing, Long received approximately $244,000 from ReVest.[22]

13.     Pursuant to the Purchase Agreement, ReVest and Long executed a one-year Lease, to begin November 1, 2005 and terminate October 31, 2006, with monthly lease payments in the amount of $1,720 per month.  The monthly payment was calculated based upon the amortization of

---

[21] Long disputes whether the deeds absolutely conveyed the properties to ReVest.  This does not effectively controvert that he executed these warranty deeds to ReVest.

[22] Long claims he cannot agree definitively to the amount because of his poor record keeping.  This does not effectively controvert the stated fact.

8

the loan ReVest obtained to finance the purchase of the Properties. Long's monthly payments were due on the first day of the month.

14.     On February 9, 2006, Brent Hurst of ReVest wrote Long a letter reiterating the terms of the Purchase Agreement, itemizing the closing and insurance costs, and summarizing the rent balances.[23]

15.     Long's payments were typically late. ReVest sent letters to Long reminding him of his monthly payments and the consequences of non-payment on February 27, 2006, April 18, 2006, April 25, 2006, and June 6, 2006.[24]

16.     On October 12, 2006, ReVest's Hurst sent Long a letter regarding the option to purchase the Properties. The letter stated: "You have indicated you are going to purchase the properties back from us. As you recall the deadline to purchase these properties on the terms of the agreement we signed is October 31st, 2006. You will need to close on the purchase of these properties by 5:00 p.m. on October 31st, 2006, otherwise, your option will expire."[25]

17.     Long did not exercise his option to repurchase all the properties. Instead, the parties negotiated a new agreement whereby Long purchased the Lark Property, and entered into a new

---

[23]  Dkt. 37-7, Ex. F, ReVest Letter Dated February 9, 2006.

[24]  Dkts. 37-8 thru 11, Exs. G-J, ReVest Letters Dated February 27, 2006, April 18, 2006, April 25, 2006, and June 6, 2006. Long claims that he does not recall receiving these letters because his memory was affected by his serious depression and stroke. This does not effectively controvert that ReVest sent these letters to him.

[25]  Long controverts the letter to the extent that the words in it do not convey the intent of the parties. Long characterizes the "option to purchase" as a means to restructure his payments to ReVest.

9

option agreement to repurchase the remaining properties, along with a new lease covering them.[26]

Long borrowed $148,000 from Wells Fargo to buy back the Lark Property from ReVest.

18.     Long believes that ReVest did what it said it would do.  His initial deposition

testimony was as follows:

Q:  At this time did ReVest do anything other than everything that they had promised they would
do?  A  I would say yes.
Q  They had done everything they'd promised to do?
A  Yes.[27]

The Court concludes that, at least with respect to the Lark tract, Long believes that ReVest did what

it said it would do.[28]

19.     The second option agreement, executed on December 29, 2006, granted Long an

option to buy-back the four remaining properties for $161,000.00 as long as it was exercised by 5

p.m. on February 28, 2007.[29]  This agreement also provided that Long could continue to lease these

properties during the option exercise period, *i.e.*, from December 26, 2006 until February 28, 2007.

20.     Long did not exercise the second option to repurchase the remaining properties.

21.     After the second option expired, Long continued to make payments to ReVest even

though there were no current written lease or unexpired option agreements pending between them.

22.     After February 2007, Brent Hurst periodically called Long for money and they would

---

[26]  Long attempts to controvert this statement by characterizing the purchase of the Lark
property as the release of a collateral on ReVest's loan to him.  This does not controvert that the
parties renegotiated and entered into a new option agreement.

[27]  Dkt. 68-2, Deposition of Freddie W. Long at 73-74.

[28]  Long's "corrected" testimony is: "Yes, they loaned me money and they took deeds and
collateral and released Lark upon payment."  As noted above, the Court disregards the corrected
testimony.

[29]  Dkt.37-13, Ex. L, Option Agreement dated December 29, 2006.

10

discuss how further payments by Long would enable him to keep his properties.[30]

23.     Long knew that as long as he made payments to ReVest, he could preserve the right to repurchase the real estate.

24.     By letter dated April 21, 2007, ReVest sent the following to Long:

> This is just a reminder that as of today I have not received your rent of $1,100.00 that was due April 1st, 2007. I know you are busy but please take a minute and send your rent payment today. The last we spoke you said you visited with your banker and you might hear something Tuesday with respect to purchasing the four remaining properties. Would [you] please call me on Tuesday to let me know what your banker says. As I have said I must remove these properties from my line of credit very soon as my time is up. If we cannot get something worked out in the next week or so I will need to move forward with selling the properties to pay off my lender.[31]

25.     ReVest sent letters reminding Long of overdue payments on July 3, 2007 and August 6, 2007.[32]

26.     On December 17, 2007, ReVest sent Long a notice to quit, vacate, and surrender possession of the St. Clair and Bonn properties if the overdue sum of $1,200.00 was not paid within three days.[33] Long paid ReVest $1,200.00 on December 19, 2007, within the three-day period.[34]

27.     Long paid ReVest $6,900 on April 21, 2008.

---

[30] ReVest controverts Long's characterization of the payments as loan payments.

[31] Dkt. 37-14, Ex. M, ReVest Letter Dated April 21, 2007. Long claims that he cannot recall receiving this letter. This does not effectively controvert that ReVest sent this letter to him.

[32] Dkts. 37-15 and 37-16, Exs N & O, ReVest Letters Dated July 3, 2007 and August 6, 2007. Long claims that he cannot recall receiving these letters. This does not effectively controvert that ReVest sent these letters to him.

[33] Dkt. 37-17, Ex. P, Three Day Notice to Quit for Nonpayment of Rent. Long claims that he cannot recall receiving this letter. This does not effectively controvert that ReVest sent this letter to him.

[34] Dkt. 46, Ex. 5, ReVest's Register.

11

28.     In a letter dated October 28, 2008, ReVest wrote Long:

On December 29, 2006, you entered into an Option Agreement and Property Lease with ReVest, LLC, which provided you both the option to purchase certain parcels of land no later than February 27, 2007, and a lease of those parcels from January 1, 2007 until February 28, 2007. You elected not to exercise your option to purchase those parcels, and since the expiration of the lease you have been a tenant-at-will under Kansas law. Pursuant to K.S.A. 58-2501 et seq., you are hereby notified that your tenancy will terminate no later than November 30, 2008, and any amounts you may be receiving from sub-tenants must be directed to this office.[35]

29.     In a letter dated November 24, 2008, ReVest's counsel wrote Long:

It is my understanding you have had some communications with ReVest regarding your continued involvement in the above properties. ReVest is willing to consider continuing its relationship with you in some form, but is not willing to engage in a protracted negotiation. If you have any interest in an immediate short term resolution or are interest in a prompt purchase of the above properties, please notify Mr. Hurst or me no later than 5:00 p.m., Wednesday, November 26, 2008. If not, please make arrangements to remove any of your belongings from the properties and provide ReVest with copies of all subtenant agreements no later than Monday, December 1, 2008.[36]

30.     ReVest's counsel sent an additional letter to Long on January 14, 2009.[37]

31.     In April and May 2009, ReVest began receiving rent from the St. Clair and Bonn properties directly from the occupants.

32.     Long paid ReVest $20,000 on June 10, 2009.[38]

---

[35]  Dkt. 37-18, Ex. Q, ReVest Letter Dated October 28, 2008. Long's lack of memory regarding receipt of this letter does not effectively controvert that ReVest sent him this letter.

[36]  Dkt. 37-19, Ex. R, Letter Dated November 24, 2008.

[37]  Dkt. 37-20, Ex. S, Letter Dated January 14, 2009.

[38]  ReVest posits that "[a]s a result of [the lump-sum] payments, ReVest did not undertake to sell the properties to third-parties, and did not undertake to terminate the tenancy on the buildings on the properties occupied by Long." Dkt. 37, Statement of Uncontroverted Facts ¶20. Long controverts ReVest's characterization of these payments as consideration for not terminating Long's tenancy and asserts that they were "pay downs" on the amount due to ReVest.

12

33.     Long filed for Chapter 13 relief on August 31, 2009.

34.     In September 2009, Long and Roger Dorphinghaus visited ReVest's office where they received a memorandum from Hurst which outlined the terms for a proposed third option to repurchase.  ReVest offered to sell the four remaining properties to Long for $172,000 if he repurchased them by November 30, 2009.  The repurchase price was not equivalent to the properties' estimated market value.  There is nothing in the record that indicates that this option proposal was reduced to an executed writing and Long did not close the repurchase.

35.     ReVest is shown as the mortgagee on the Properties' insurance.

36.     ReVest filed this adversary proceeding on December 11, 2009.

37.     Long filed his Answer and Counterclaim on January 13, 2010, and an Amended Counterclaim on June 16, 2010.

38.     Long converted this case to one under Chapter 11 on March 26, 2010.

39.     There are no current written leases in effect between Long and ReVest.  There are no unexpired option agreements between Long and ReVest.

V.      Analysis and Conclusions of Law

        Background

In the Fall of 2005, Long needed money to deal with a tax debt.  Apparently unable to borrow from conventional sources, he turned to ReVest, who offered to acquire his rental real estate and his homestead for cash and to lease the properties back to Long, granting him an option to repurchase them for what ReVest paid him plus interest and a fee.  The parties executed the October 4, 2005 Purchase Agreement and Long deeded over his properties.  When the 2005 option expired, ReVest issued a second option in 2006 in exchange for a cash payment made by Long.  Long claims

13

that the sale and leaseback transactions were loans secured by the Properties while ReVest claims

they were what they nominally appear to be, sales. In addition, Long also claims that ReVest took

advantage of his health and depression following his wife's death and used its dominant economic

position to defraud him, committing not only common law fraud, but also violating the KCPA.

On summary judgment, ReVest first argues that Long's KCPA and fraud claims covering

the Purchase Agreement are time-barred because any representations made in connection with the

Purchase Agreement occurred after the applicable statutes of limitation expired.[39] ReVest also

argues that nothing in the facts support finding that it made any misrepresentations to Long.[40]

ReVest also claims that the facts do not demonstrate unconscionable conduct on ReVest's part and

that the KCPA does not apply to these transactions in any event.[41] Based on all the documents,

ReVest maintains that no facts preclude the Court from determining that it is the owner of the

Properties.

    A.       Long's KCPA Claims and the Statute of Limitations

    1. *KCPA Generally*

Long asserts that ReVest acted unconscionably when it induced him to enter into the

Purchase Agreement in 2005. Kan. Stat. Ann. § 50-627(a) states that no "supplier" shall engage in

an unconscionable act or practice in connection with a "consumer transaction." A "consumer" is

defined in the Act as an individual who seeks or acquires "property or services for personal, family,

---

[39] Dkt. 37 at 8.

[40] *Id*. at 7 ("...nothing in the facts...supports any misrepresentation").

[41] Dkt. 68 at 8.

household, business or agricultural purposes."[42] A "supplier" is a "manufacturer, distributor, dealer, seller, lessor, assignor, or other person" who engages in "consumer transactions," but the definition of supplier does not include any "bank, trust company or lending institution" that is state- or federally regulated.[43] A "consumer transaction" is a "sale, lease, assignment, or other disposition for value of property or services" to a consumer.[44] An unconscionable act "violates this act when it occurs before, during or after the transaction."[45] "Services" are broadly defined in the Act and in the cases and include personal services, privileges, and "any other act performed for a consumer by a supplier."[46] "Property" includes real estate.[47]

Whether an act is unconscionable is a question of law, but the Court is to consider the circumstances that the supplier knew of or should have known, including, but not limited to: (a) whether the supplier took advantage of the consumer's infirmity; (b) whether the consumer was unable to receive a material benefit from the transaction; (c) whether the transaction was excessively one-sided in favor of the supplier; or (d) whether the supplier misled the consumer with a statement of opinion.[48]

---

[42] Kan. Stat. Ann. § 50-624(b).

[43] Kan. Stat. Ann. § 50-624(j).

[44] Kan. Stat. Ann. § 50-624(c).

[45] Kan. Stat. Ann. § 50-527(a).

[46] Kan. Stat. Ann. § 50-624(i). *Moore v. Bird Eng'g Co., P.A.*, 273 Kan. 2, 41 P.3d 755 (2002) (definition of services is very broad).

[47] Kan. Stat. Ann. § 50-624(h).

[48] Kan. Stat. Ann. § 50-627(b)(1), (3), (5), and (6), respectively. The Court believes these are the most applicable parts of § 50-627 to this case.

15

Long meets the definition of consumer and ReVest, not being a regulated lending entity, is a supplier that offered Long a service (purchase and lease-back) as opposed to property. The Purchase Agreement would qualify as a consumer transaction as would the subsequent option agreements. Only specific actions are deemed violations. Continuing violations are only actionable if they are "not identified to be in connection with a specific identifiable consumer transaction but []continuing in nature."[49] With the statutory parameters of the KCPA claim in mind, we first address the effect of the statute of limitations on it.

2. *The KCPA Three-year Statute of Limitations, Kan. Stat. Ann. § 60-512*

This Court previously analyzed the timeliness of Long's claims in connection with ReVest's initial motion to dismiss Long's Counterclaim and ruled that as pled, Long's KCPA and fraud claims were time-barred.[50] Actions for violating a statute have a three-year limitation as provided in Kan. Stat. Ann. § 60-512. Long argued that the statute of limitations had not run on his KCPA, fraud or quiet title claims because ReVest's continuing conduct constitutes a continuing tort that tolls the statutes. The Court declined to apply the continuing violations rule to Long's KCPA claim because (1) his Counterclaim lacked facts tying his payments to misrepresentations made within three years of him filing the claim and (2) the doctrine is a narrow concept that is applied only where there is explicit statutory language directing its application and the KCPA statute did not contain such language. As noted above, Kan. Stat. Ann. § 50-636(d) expressly excludes continuing violations that are connected to a specific transaction from the scope of actionable violations under the Act.

Long filed an Amended Counterclaim containing factual allegations that ReVest made

---

[49] Kan. Stat. Ann. § 50-636(d).

[50] Dkt. 29.

16

misrepresentations to Long in April 2008, June 2009, and September 2009, which induced him to continue making monthly payments and two large lump-sum payments. ReVest argues that Long's KCPA claim in connection with the Purchase Agreement and the acquisition of the Properties is barred because the alleged unconscionable activity with respect to that transaction occurred more than four years prior to the filing of the claim, barring reformation of the deeds. Long argues the additional facts detailed in his amended complaint, his affidavit, and the discovery materials require that the Court apply the continuing violations rule to find that his KCPA claim is not barred. Long also notes that as a debtor in possession, he may claim the benefit of § 108(a) which extends an unexpired statute of limitations for a period of two years after the date of his bankruptcy petition. Thus, his KCPA claim relating to the 2006 option agreement is not time-barred.

3. *The KCPA Purchase Agreement Claim Is Barred*

Long insists that the amended facts warrant applying the continuing violations rule to his KCPA claim. He forgets that the KCPA statute does not explicitly provide for that. Indeed, Kan. Stat. Ann. § 50-636(d) explicitly deals with continuing violations and expressly excludes those that are connected to a specific transaction from the scope of actionable violations under the Act.

Nor does it help that his KCPA claim is fraud-based. Long relies on the case of *Alexander v. Certified Master Builder Corp*[51] to urge the Court to count the time from Long's discovery of the wrong. *Alexander* is not binding on this Court, but the opinion of the highest Kansas appellate court on this point is. The Kansas Court of Appeals rejected *Alexander's* approach recently in *Four Seasons Apartments, Ltd. v. AAA Glass Serv., Inc*, where it drew a clear distinction between the lack of a discovery provision or a period of repose in Kan. Stat. Ann. § 60-512 and the presence of both

---

[51] 43 F.Supp.2d 1242 (D. Kan. 1999).

in the fraud statute of limitations, Kan. Stat. Ann. § 60-513(b).[52]  Thus, Long's additional allegations

that ReVest made misrepresentations to him in April 2008, June 2009, and September 2009 do not

revive the KCPA claim pertaining to the Purchase Agreement.  The Court does not view the KCPA

claim as one scheme, rather it considers each transaction between the parties as a separate potential

KCPA violation and claim.

A KCPA claim accrues on the date of the alleged unconscionable act or practice regardless

of when the alleged unconscionable act is discovered.[53]  Because of Long's status as a debtor in

possession  and  pursuant  to  § 108(a),  the  Court  must  first  determine  whether  the  applicable

nonbankruptcy statute of limitations period has expired before Long filed his bankruptcy petition.

If that period has not expired, § 108 extends the statute of limitations for an additional two years

from when the bankruptcy action was filed.  Because the Purchase Agreement was executed on

October 14, 2005, the statute of limitations for a KCPA claim in connection with it expired on

October 14, 2008, well before Long filed his bankruptcy petition.  Section 108 does not save the

statute of limitations on that claim.  Long's KCPA Purchase Agreement claim is barred.[54]

4.     *The KCPA Claims on the 2006 Option and Lease, the April 2008 and June 2009
       Lump-sum Payments, and the Offer of the September 2009 Option Agreement Are
       Not Time-barred.*

---

[52]  37 Kan.App.2d 248, 250, 152 P.3d 101, 104 (2007), referring to *Johnsmeyer v. Hanover Development Co. II*, Case No.  93,158, 2005 WL 2495817 (Kan. App. Oct. 7, 2005) (unpublished).

[53]  *Agristor Leasing v. Meuli*, 634 F.Supp. 1208, 1213 (D. Kan. 1986) (KCPA cause of action accrues when the transaction in question takes place).

[54]  ReVest also argued that its acquisition of the Properties were beyond the terms of the KCPA because it did not involve a sale of property "to a consumer."  The Court need not address this argument given its determination that the KCPA claim covering the Purchase Agreement was time-barred.

18

Case 09-05303   Doc# 102   Filed 03/01/11   Page 18 of 29

With respect to Long's KCPA claim covering the December 29, 2006 option agreement, the statute of limitations period for that claim expired three years from the date of that agreement, on December 29, 2009.  Because that period had not expired before Long filed his bankruptcy petition on August 31, 2009, § 108(a) extended the statute of limitations an additional two years from the petition date to August 31, 2011.  Thus, Long's KCPA claim covering the 2006 option agreement was timely filed and is not barred.[55]  Likewise, Long's KCPA claims covering the April 2008 and June 2009 lump-sum payments and the offer of the third option were timely filed and are not barred.

B.      Long's Fraud Claim and the Statute of Limitations, Kan. Stat. Ann. § 60-513

Long's fraud claim is based on the same facts and transactions that underpin his KCPA claims, that he was led to enter into a transaction that was not what he thought it was by a series of misrepresentations by ReVest upon which he relied to his detriment.  ReVest argues that Long's fraud claim is barred because it accrued on October 4, 2005, when Long signed the deeds and the Purchase Agreement, or at the latest on December 17, 2007, the date Long received ReVest's Three-Day Notice to Quit, which "should have clued Long [] that ReVest claimed ownership of the property."  ReVest claims that under either accrual date, Long's counterclaim, filed on January 13, 2010, was filed outside the two-year period.

Kan. Stat. Ann. § 60-513(a)(3) provides that an action for fraud shall be brought within two years, but that the cause of action shall not be deemed to have accrued until the fraud is discovered. Kan. Stat. Ann. § 60-513(b) provides that:

> a cause of action shall not be deemed to have accrued until the act giving rise to the
> cause of action first causes substantial injury, or, if the fact of injury is not

---

[55]  We note that neither party raised or discussed § 108 in their briefing on the first Motion to Dismiss.

reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.

ReVest ignores the distinction between Kan. Stat. Ann. § 60-512 which lacks a period of repose or a discovery provision and that which applies to fraud claims, Kan. Stat. Ann. § 60-513. Indeed, ReVest argued that the latest time Long could have discovered the fraud was December 17, 2007. Long filed his bankruptcy case on August 31, 2009, well-within the running of the two-year statute of limitations. Section 108(a) saves his fraud claim. In addition, if ReVest made misrepresentations to Long to induce the April 2008 and June 2009 payments or to induce Long's entry into an option arrangement in September 2009, Long could claim that he did not discover ReVest's perfidy until his failure to exercise the 2009 option resulted in ReVest's taking "his" Properties.[56] Whatever its merits may be, Long's fraud claim is timely.

C. Summary Judgment Analysis

1. *Long's Non-barred KCPA Claims (the 2006 Option and Lease Agreement, the Lump-sum Payments, and the 2009 Option Offer).*[57]

ReVest indulges in a mechanical argument to contend that the KCPA doesn't apply to these claims because Long, as a seller, is the "supplier" and ReVest as the purchaser stands in the shoes of a "consumer," but isn't one. Under Long's theory, he is the "consumer" and ReVest the

---

[56] Under this scenario, Long has no need of § 108 to extend the statute of limitations period for Long's fraud claim. Long's bankruptcy petition was filed on August 31, 2009 and the last pleaded fraudulent act occurred in November 2009.

[57] ReVest filed its second motion for summary judgment before this Court issued its order denying Long's request to add a KCPA claim for deceptive acts and practices pursuant to Kan. Stat. Ann. § 50-626. The Court will only consider ReVest's summary judgment arguments that relate to Long's KCPA claim for unconscionable acts and practices under Kan. Stat. Ann. § 50-627.

20

"supplier." The Court concludes that on the summary judgment record, Long could make out a claim that some of these transactions, including the leases, the options to purchase, and the extensions on the option to repurchase were unconscionable. Kan. Stat. Ann. § 50-627(a) provides that no supplier shall engage in an unconscionable act or practice "in connection with a consumer transaction." Thus, the Court considers whether, as a matter of law, what ReVest did in connection with each of these transactions is unconscionable, guided by the non-exclusive list of factors contained in Kan. Stat. Ann. § 50-627(b). They are:

(1)    The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

(2)    when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

(3)    the consumer was unable to receive a material benefit from the subject of the transaction;

(4)    when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

(5)    the transaction the supplier induced the consumer to enter into was excessively one-sided in favor of the supplier;

(6)    the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

(7)    except as provided by K.S.A. 50-639, and amendments thereto, the supplier excluded, modified or otherwise attempted to limit either the implied warranties of merchantability and fitness for a particular purpose or any remedy provided by law for a breach of those warranties.[58]

In *Wille v. Southwestern Bell Tel. Co.*,[59] the Kansas Supreme Court identified 10 factors to consider in determining whether an act is unconscionable under the KCPA:

(1) The use of printed form or boilerplate contracts drawn skillfully by the party in

---

[58]    Kan. Stat. Ann. § 50-627(b).

[59]    219 Kan. 755, 549 P.2d 903 (1976).

21

the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position (*Henningsen v. Bloomfield Motors, Inc., supra; Campbell Soup Co. v. Wentz*, 3 Cir., 172 F.2d 80); (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods (*Williams v. Walker-Thomas Furniture Company*, 121 U.S.App.D.C. 315, 350 F.2d 445; 18 A.L.R.3d 1305); (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect (*In re Elkins-Dell Manufacturing Company*, 253 F.Supp. 864, (E.D.Pa.)); (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract (*Henningsen v. Bloomfield Motors, Inc.,supra*); (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate (*Williams v. Walker-Thomas Furniture Company, supra*); and (10) inequality of bargaining or economic power. (*See also* Ellinghaus, 'In Defense of Unconscionability', 78 Yale L.J. 757; 1 Anderson on the UCC, s 2-302, and cases cited therein.)

The Court must also consider general contract principles. A general principle of contract law is that competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake or duress, a party who has entered into such contract is bound thereby.[60] This rule applies regardless of a party's failure to read the contract,[61] even if the contract turns out to be disadvantageous to the complaining party.[62] Bad deals are not necessarily unconscionable.

Long claims ReVest acted unconscionably because: (1) it took advantage of his weakened emotional and mental state; (2) it exacted an interest rate grossly exceeding that which would be charged in similar transactions at the time when the Purchase Agreement was made; (3) the

---

[60] *Squires v. Woodbury*, 5 Kan.App.2d 596, 598, 621 P.2d 443 (1981).

[61] *Washington v. Claasen*, 218 Kan. 577, 580, 545 P.2d 387 (1987).

[62] *Wille*, 219 Kan. at 757.

22

transaction was excessively one-sided in favor of ReVest; (4) the purchase price of $250,000 was substantially less than the value of the properties; and (5) ReVest continually made misleading statements that he would be able to repurchase the properties even after the expiration of the option agreements.[63] Long continues to assert that all of these transactions form one integrated scheme to defraud him, beginning with the Purchase Agreement. But his claim concerning the Purchase Agreement is barred. In the context of a KCPA claim, the Court considers each subsequent transaction separately and determines whether the uncontroverted facts and inferences drawn from them support a conclusion that ReVest is entitled to judgment as a matter of law that it did not act unconscionably.

a.     <u>The 2006 Option Agreement and Leases</u>

The original Purchase Agreement granted Long an option to repurchase the Properties on or before October 31, 2006. He had deeded all of the Properties to ReVest when the Purchase Agreement closed in 2005 and executed a lease that was coterminous with the option, also expiring on Halloween, 2006. On October 12, 2006, ReVest wrote to Long and warned him that if the option prices were not paid by October 31, the option would expire. Thereafter, Long and ReVest renegotiated an arrangement whereby he could partially exercise his option by repurchasing the Lark tract for $148,000. He repurchased Lark. In addition, Long and ReVest signed a second option agreement on December 29, 2006 pursuant to which Long's option to repurchase the remaining Properties was extended to February 28, 2007. In tandem with this, Long signed a coterminous lease on the remaining properties.

Long claims the lease agreement was the vehicle by which ReVest received payments on the

---

63 Dkt. 36, ¶31(c) and Count I, ¶4.

23

mortgage it held against his properties.[64]  He says that the lease did not transfer the normal risks and responsibilities of a lessor to ReVest because Long paid the taxes and insurance on the Properties[65] and the lease payments were based on an amortization of ReVest's debt to US Bank, not actual market rents.  Long ignores the reality that most, if not all commercial leases are "net" propositions that burden the tenant with taxes and insurance and relies on his characterization of the uncontroverted facts to argue that the lease was in fact a loan repayment vehicle.

Applying the unconscionability factors in Kan. Stat. Ann. § 50-627 to the 2006 option and lease transactions, the Court finds nothing in the uncontroverted facts that would support a finding that ReVest took advantage of Long's infirmity or that Long was charged more rent than was appropriate.  Indeed, one of Long's persistent arguments in this case is that the Properties were worth far more than ReVest paid (or loaned) him for them.  Long can hardly argue that ReVest undervalued the properties, but charged a "grossly excessive" rent to repay the US Bank loan it incurred to pay the too-low price.  Nor is there any evidence in the summary judgment record of Long's medical or mental condition in December of 2006 from which the Court could conclude that ReVest took advantage of his condition then.  Long received several material benefits from the transactions.  He got the Lark house back and he retained possession of "his" rentals for a period of time.  The option document has been interlineated which suggests that Long actively negotiated it and negates his argument that it was somehow "one-sided in favor of the supplier."  The lease appears to the Court to be pretty typical of short-form commercial leases.  There may well have been

---

[64]  Dkt. 46 at 13.

[65]  Dkt. 36, ¶31(a).

unequal bargaining strength, but that alone is not enough to support a finding of unconscionability.[66]

ReVest should have summary judgment on the KCPA claim as it relates to the 2006 consumer transactions.

b.    <u>The Lump-sum Payments</u>

Long did not exercise the 2006 option on or before February 28, 2007. Instead, he continued to make payments to ReVest even though the option and lease had expired. Periodically, Brent Hurst would call Long and they would discuss how further payments would allow Long to retain the Properties. ReVest essentially treated Long as a month-to-month tenant at sufferance, soliciting and collecting rents in the amounts set in the 2006 lease. On December 17, 2007, ReVest sent Long a notice to quit and alleged that Long was delinquent on his December rent for the St. Clair and Bonn Properties. Long paid up. On April 21, 2008, Long paid ReVest $6,900, an amount that the Court cannot square with the rents due under the month-to-month scheme.[67]

Long says that the lump-sum payment was a large "paydown" of ReVest's loan, and not consideration for any extension of an option to repurchase. The most recent option had expired on February 27, 2007. Long claims when he made the lump-sum payment in April of 2008, he was assured that it would be applied to his loan balance and that he would be able to keep the Properties. He received the same assurance when he made the $20,000 lump-sum payment in June of 2009. ReVest does not deny making these assurances, only the manner in which Long characterizes them.

---

[66] *See Wille,* 219 Kan. at 758.

[67] The Court carefully examined the evidence submitted in support of and in opposition to the summary judgment motions and could not conclude that this cash payment or the subsequent $20,000 payment represented past-due rent, advance rent, or were even multiples of the rent. In short, these payments are, at best, unexplained in the context of a lease.

25

Because nothing in the summary judgment record explains what these payments were for, and because there is a material factual dispute concerning whether ReVest told Long anything to induce these payments, the Court may infer that Long made these payments in reliance on ReVest's representations. The remaining factual dispute surrounding the lump-sum payments requires that ReVest be denied summary judgment on Long's KCPA claims pertaining to them.

　　　　2.　　Long's Fraud Claim

Long's fraud claim, generally stated, is that he was induced to enter into the 2005 Purchase Agreement and option by material misrepresentations made by ReVest's principals and that a continuing pattern of misrepresentation and fraud has attended his relationship with ReVest since that time until the filing of his bankruptcy case. Essentially, Long claims that this series of misrepresentations were made to induce him to keep paying ReVest in the forlorn hope that ReVest would reconvey the Properties to him. Long points to these misrepresentations as well as those made concerning the true nature of the Purchase Agreement, option and lease, essentially dressing up a credit transaction as a sale. ReVest denies that it made any misrepresentations and asserts that Long knew what he was doing from 2005 when he made the first deal until the time of his bankruptcy case.[68]

To prove fraud, Long will have to show the following: (1) false or untrue representations made as a statement of existing and material fact; (2) representations were known to be false (or untrue) by the party making them, or were recklessly made without knowledge concerning them, (3) representations were made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made, and (5) the other party

---

[68] Dkt. 37 at 7.

sustained damage by relying upon them.[69]  Long claims that ReVest misrepresented the Purchase Agreement by stating that it was a loan and not a sale and by telling Long that if he continued to make payments, he would be permitted to pay off the "loan" and keep the Properties.  Long claims that after the 2005 and 2006 option agreements expired, ReVest continued to induce him to make payments by representing that these payments would go toward Long's repurchase and that the option to repurchase would continue to be available.[70]  Only when he did not close the repurchase offered in 2009 did ReVest take serious action to dispossess him of the Properties.

Drawing all reasonable inferences in Long's favor, the Court concludes that factual disputes remain concerning what ReVest's principals said to Long concerning the nature of the transaction, *i.e.*, was it a sale or a mortgage, and what, if any, representations they made to Long after the second option expired on February 28, 2007.  There is also a dispute about what the lump-sum payments were for.  The presence of these disputes prevents summary judgment on the fraud claim.  The Court may consider all of the facts and circumstances leading up to the execution of the Purchase Agreement in 2005, as well as what transpired thereafter, as an integrated scheme or series of activities undertaken to defraud Long.  Whether Long can prove that is another story, but on summary judgment, the existence of disputed material facts concerning whether and what representations were made and the extent of Long's detrimental reliance on them requires ReVest's motion to be denied as to this claim.

3.      The Quiet Title Claims

---

[69]  Pattern Instructions Kansas Civil 4th § 127.40 (2008); *Newcastle Homes, LLC v. Thye*, 44 Kan.App.2d 774, 788-789, 241 P.3d 988 (Kan. 2010).

[70]  Dkt. 36, Count III, ¶4 at 9.

27

ReVest's original complaint proceeded on the theory that this Court should quiet title in the remaining Properties in ReVest. In turn, Long counter-claimed that ReVest had obtained title to these Properties through its unconscionable acts and by fraud. He generally asserts that the deeds delivered to ReVest were given as security for a debt rather than as absolute conveyances. His papers variously refer to "setting aside" and "reforming" the deeds as a remedy for ReVest's misconduct, and seeks to quiet title to the Properties in himself.

ReVest argues that because Long has no viable claim remediable by reformation, it should have a declaratory judgment that it owns the Properties and that Long is a mere tenant. Kan. Stat. Ann. § 60-1002(a) provides that "any person claiming title or interest in personal or real property" may bring an action for quiet title against "any person who claims an estate or interest therein adverse to him or her, for the purpose of determining such adverse claim."[71] Kansas law recognizes that deeds may be given as security and numerous Kansas cases address the equitable considerations that courts take in determining whether a deed is really an equitable mortgage.[72] Even if Long did not succeed in proving that ReVest committed fraud in its dealings with him, he could prove (by clear and convincing evidence) that the deeds were given as mortgages. Therefore, there remain genuine factual disputes about whether the Purchase Agreement and subsequent transactions were conveyances or financing arrangements. A legal controversy also remains regarding whether the deeds were given as a mortgage. Neither ReVest's nor Long's quiet title claim is ripe for summary

---

[71] Kan. Stat. Ann. § 60-1002; *Ferrell v. Ferrell*, 11 Kan.App.2d 228, 231, 719 P.2d 1 (1986) (definition of a quiet title action: two parties asserting adverse interests with regard to certain property).

[72] *See Berger v. Bierschbach*, 201 Kan. 740, 443 P.2d 186 (1968) and cases cited therein.

judgment on this record.  ReVest's motion is therefore denied.

VI.     <u>Conclusion</u>

The Court grants ReVest's summary judgment motions in part and denies them in part as follows.  Summary judgment for ReVest and against Long is GRANTED on the KCPA claim concerning the Purchase Agreement because it is barred by the statute of limitations.  ReVest is GRANTED summary judgment on the KCPA claim covering the 2006 option and lease; the Court finds that the 2006 option and lease were not unconscionable as a matter of law.   ReVest is DENIED summary judgment on Long's KCPA claim in connection with the 2008 and 2009 lump-sum payments and the 2009 option offer; on Long's fraud claim; and on ReVest's and Long's quiet title claims.

# # #